# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 11-20220-cr-JORDAN/McALILEY

UNITED STATES OF AMERICA

vs.

MERCATOR SHIP MANAGEMENT, S.A.,
        d/b/a BERNUTH LINES,

        Defendant.

_____/

## PLEA AGREEMENT

The United States of America and MERCATOR SHIP MANAGEMENT, S.A., d/b/a BERNUTH LINES, (hereinafter referred to as the "defendant") enter into the following agreement:

**PROFFER OF FACT**

1.      The defendant and the United States agree that the United States could prove the following facts beyond a reasonable doubt:

a.  The M/V NERA II is a ninety-meter cargo ship with a gross tonnage of 2,472 tons.  It regularly undertakes voyages between Terminal Island, Miami, Florida and El Rama, Nicaragua.  Terminal Island is a cargo terminal directly across Government Cut from Lummus Island and Fisher Island, and adjacent to Causeway Island.

b.  The NERA II is owned by a company called NERA LTD. and technically managed by the defendant.  Both companies do business as BERNUTH LINES.

c.  On March 17, 2010 a team of United States Coast Guard examiners boarded the M/V NERA II at Terminal Island in order to conduct a routine inspection.  They noticed an oily sheen forming at the stern, or back end, of the ship.  Some of the crew members from

the NERA II informed the Coast Guard examiners that there was a leak in the stern tube and propeller system.

d. On March 24, 2010, the Coast Guard issued a Letter of Warning to the defendant for the discharge and for the defendant's failure to notify the Coast Guard of a hazardous condition. The Letter of Warning was in lieu of a civil penalty.

e. On July 21, 2010, the Coast Guard examined the NERA II again at Terminal Island. This time, they noticed a rainbow-colored sheen forming on the surface of the water at the stern of the NERA II. The master of the ship informed the Coast Guard that he had notified the defendant of the leak and the need for repairs.

f. Representatives of the defendant stated to the Coast Guard that, since the March 2010 inspection, the ship had switched to a biodegradable lubricating oil called Hydrox Bio 68. The Coast Guard then informed the defendant that Hydrox Bio 68 was a pollutant and oil under the Clean Water Act.

g. On July 21, 2010, the Coast Guard issued a Notice of Violation to the defendant and a Notice of Federal Interest for an Oil Pollution Incident to the defendant for the leak. Additionally, the Coast Guard required the defendant to submit a plan to repair the stern tube and propeller leak as a condition of departure from Miami.

h. On July 22, 2010, the defendant submitted documentation to the Coast Guard stating that the NERA II would enter dry dock to repair the leak. Relying upon this assurance, the Coast Guard then permitted the NERA II to depart Miami.

i. The NERA II continued to operate, making routine voyages including numerous arrivals into and departures from Terminal Island.

2

j.  On January 4, 2011, the Coast Guard again observed a sheen emanating from the stern of the M/V NERA II at Terminal Island. The ship's Master and Chief Engineer, as well as a representative of the defendant, confirmed that the defendant had not repaired the stern tube and propeller. They further confirmed that the source of the sheen was Hydrox Bio 68 leaking from the ship's propeller.

k.  Hydrox Bio 68 leaked from the NERA II into the navigable water of the United States on at least two or more occasions.

l.  Pursuant to 14 U.S.C. § 89 and 33 C.F.R. subpart 6.04, the Coast Guard has the authority to enforce United States laws and regulations, to inspect any vessel within the jurisdiction of the United States, and control the movement of any vessel within the territorial waters of the United States.

m.  Government Cut and the Miami River are navigable waters of the United States.

**TERMS OF THE AGREEMENT**

2.      The defendant agrees to plead guilty to count two of the Information, which count charges the defendant with knowingly discharging oil into and upon the navigable waters of the United States, in violation of Title 33, United States Code, 1321(b)(3) and 1319(c)(2)(A). The elements of this offense are:

a.  That the Defendant discharged oil or a hazardous substance;

b.  That the discharge occurred into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the water of the contiguous zone;

c.  That the discharge was in such quantities as may be harmful;

d.  That the Defendant acted knowingly;

3

e. That each of the acts committed by the employees or agents of the Defendant corporation was within the course and scope of the employment or agency given to the employee or agent by the corporate defendant; and

f. That the employees or agents of the corporation committed each act of the offense with the intent to benefit the corporation.

3. The United States agrees to seek dismissal of Count 1 of the Information after sentencing.

4. The defendant is aware that the sentence will be imposed by the court after considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the court relying in part on the results of a Pre-Sentence Investigation by the court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose that sentence; the court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the defendant understands and acknowledges that the court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in

4

paragraph 2 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

5.     The defendant also understands and acknowledges that the court may impose a term of probation of not less than one year and not more than five years.  The United States and the defendant agree that, although not binding on the court, they shall jointly recommend a term of probation of one year.

6.     The United States and the defendant also agree that, although not binding on the Court, they will jointly recommend the following special conditions of probation:

a)  That the defendant complies with the Environmental Compliance Plan ("ECP") that is contained in Attachment A to this Plea Agreement.   The defendant understands and agrees that the ECP shall apply to the five subject vessels listed in the ECP so long as those vessels are either owned, controlled, technically managed, or operated by the defendant or any company affiliated with the defendant.  Those vessels are known as:

(1) *M/V NERA II – IMO # 8502365*
(2) *M/V CARIBBEAN JADE – IMO # 9160504*
(3) *M/V EL RAMA – IMO # 8404288,*
(4) *M/V BERNUTH CALYPSO – IMO # 9212448*
(5) *M/V YOKAMU – IMO # 7217054*

b) That the defendant shall complete its Community Service obligation imposed under paragraph 8 of this agreement.

7.     In addition to a term of probation, the court may impose a fine of not less than $5,000 and up to the greater of $50,000 per day of violation or twice the gross gain.  The United States and the defendant agree that, although not binding on the Court, that they will jointly recommend a total criminal fine of $100,000.  The parties agree to jointly recommend that the defendant shall pay $50,000 at the time of sentencing.   This payment shall comprise the

5

community service payment recommended in paragraph 8 of this plea agreement. The parties further agree to jointly recommend that the defendant shall pay an additional $25,000 no later than 90 days after the date of the Court's sentencing order, and that the defendant shall pay the final $25,000 no later than 180 days after the date of the Court's sentencing order. The parties further agree that the payments shall be made payable to Clerk, United States Courts, and forwarded to: U.S. Clerk's Office, 400 North Miami Avenue, Room 8NO9, Miami, Florida 33128.

8.    The United States and the defendant agree to recommend that $50,000 of the total criminal fine amount of $100,000 be suspended for the explicit purpose of the defendant applying the suspended amount to performing Community Service pursuant to § 8B1.3 of the Federal Sentencing Guidelines and in furtherance of satisfying the sentencing principles provided for under 18 U.S.C. § 3553(a).   The explicit goal of the defendant's Community Service is to fund environmental projects and initiatives designed for the benefit, preservation, and restoration of the environment and ecosystems in the waters of the United States in South Florida. These projects are to include, but are not limited to, coral reef science and restoration, marine resource enhancement and protection, and oil damage research and restoration. According, the defendant agrees that the $50,000 of the total criminal fine amount due at sentencing shall be paid to the South Florida National Parks Trust. The South Florida National Parks Trust is a charitable and non-profit 501(c)(3) corporation that was established by the National Park Foundation to raise donations from individuals, businesses and foundations to support park programs in critical areas.

9.    The defendant agrees that because the payment to the trust listed in paragraph 8 is a community service by an organization, the defendant shall not seek any reduction in its tax

6

obligations as a result of such community service payment. The defendant further agrees that because this payment is part of a criminal settlement agreed upon in its plea agreement, the defendant shall not characterize, publicize, or refer to the payment as anything other than a community service payment made as a condition of probation incidental to a criminal conviction.

10.     The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 4 of this agreement, a special assessment in the amount of $400 shall be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing.

11.     The Office of the United States Attorney for the Southern District of Florida (hereinafter "Office") reserves the right to inform the court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background.

12.     The United States and the defendant agree that the jointly recommended sentence contained in this Plea Agreement is not binding on the probation office or the Court.

13.     The defendant is aware that Title 18, United States Code, Section 3742 affords the defendant the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Section 3742 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or a variance from the guideline range that the court establishes at sentencing. The defendant further understands that nothing in this agreement shall affect the government's right

and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b). However, if the United States appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released from the above waiver of appellate rights. By signing this agreement, the defendant acknowledges that it has discussed the appeal waiver set forth in this agreement with its attorney. The defendant further agrees, together with the United States, to request that the district court enter a specific finding that the defendant's waiver of its right to appeal the sentence to be imposed in this case was knowing and voluntary.

14.     The defendant is aware that the sentence has not yet been determined by the court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the court. The defendant understands further that any recommendation that the government makes to the court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the court and the court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 4 above, that the defendant may not withdraw its plea based upon the court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

8

15.     This plea agreement, including Attachment A, the Environmental Compliance Plan, is the entire agreement and understanding between the United States and the defendant. There are no other agreements, promises, representations, or understandings unless contained in a letter from the United States Attorney's Office executed by all parties and counsel prior to the change of plea.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 4/13/11                       By: _____
                                         JAIME A. RAICH
                                         ASSISTANT UNITED STATES ATTORNEY

Date: _____                   By: _____
                                         MICHAEL G. CHALOS
                                         ATTORNEY FOR DEFENDANT

Date: _____                   By: _____
                                         JORDAN MONOCANDILOS
                                         Authorized Representative of
                                         MERCATOR SHIP MANAGEMENT, S.A.,
                                         d/b/a BERNUTH LINES
                                         DEFENDANT

omnibus.ins

9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 11-20220-cr-JORDAN/McALILEY

UNITED STATES OF AMERICA

vs.

MERCATOR SHIP MANAGEMENT, S.A.,
      d/b/a BERNUTH LINES,
          Defendant.

_____/

## ENVIRONMENTAL COMPLIANCE PLAN

      The following standards and requirements for an ENVIRONMENTAL COMPLIANCE PROGRAM ("ECP") have been prepared pursuant to the Plea Agreement between MERCATOR SHIP MANAGEMENT, S.A., d/b/a BERNUTH LINES, (hereinafter "MERCATOR") and the United States (hereinafter "Government") filed in the United States District Court for the Southern District of Florida. Compliance with all of the standards and requirements of the ECP is an essential term of the Plea Agreement. The vessels currently covered under this ECP are known as:

     (1)   *M/V NERA II – IMO # 8502365*
     (2)   *M/V CARIBBEAN JADE – IMO # 9160504*
     (3)   *M/V EL RAMA – IMO # 8404288*
     (4)   *M/V BERNUTH CALYPSO – IMO # 9212448*
     (5)   *M/V YOKAMU – IMO # 7217054*

      The ECP includes various provisions to ensure that all vessels directly or indirectly owned, operated, managed, manned and/or controlled by MERCATOR, and any company affiliated with MERCATOR, and which call at ports or places in the United States, comply with all maritime environmental requirements established under applicable international, flag state, and port state law, including, but not limited to, the International Convention for the Safety of Life at Sea (SOLAS), the International Safety Management (ISM) Code, the International Convention for Prevention of Pollution from Ships (MARPOL), and all applicable Federal and state statutes and regulations including, but not limited to, the Ports and Waterways Safety Act (PWSA), the Act to Prevent Pollution from Ships (APPS), the Clean Water Act (CWA) and the Oil Pollution Act (OPA), and with the requirements of this agreement itself.

ATTACHMENT A to the Plea Agreement
Environmental Compliance Plan
United States v. Mercator Ship Management, S.A., d/b/a Bernuth Lines

## A. APPLICABILITY/PURPOSE

(1) This ECP shall cover and apply to all of MERCATOR's operations, including all subsidiaries, affiliated business entities, and agents (owned wholly or partially by MERCATOR), involved in the operation of seagoing vessels which are operated, managed and/or manned by MERCATOR, on the date of sentencing or at anytime during the period of probation. It shall also include all persons working for MERCATOR, its subsidiaries, affiliated business entities, agents, and any other individuals or organizations who are involved in the operation, maintenance and repair of aforesaid seagoing vessels, operated, managed and/or manned by MERCATOR, as direct employees, on the date of sentencing or at any time during the period of probation.

(2) The M/V YOKAMU, IMO #7217054 is currently in a laid-up condition. Prior to using the M/V YOKAMU for a voyage, MERCATOR shall hire the Independent ECP Consultant to audit the ship and ensure that it fully complies with this ECP and all relevant laws and regulation. In the meantime, any activity conducted on board the M/V YOKAMU shall strictly adhere with all laws and regulations and the conditions and standards articulated in this ECP.

(3) The ECP is not intended to replace the ISM Code, or any other applicable international legal requirement or United States statute and regulation. The purpose of this ECP is to augment the requirements of existing law by increasing and improving inspections, reviews, and audits of MERCATOR's operated and/or managed vessels which call at ports or places in the United States, shore side facilities, and operations involving said vessels; develop and implement management and engineering controls to better manage, and detect and prevent environmental violations; and require a final report to the United States Probation Office for the Southern District of Florida, the United States Attorney's Office for the Southern District of Florida, and the United States Coast Guard to ensure that MERCATOR is following the requirements of this ECP.

## B. CORPORATE COMPLIANCE MANAGER

(1) Within sixty (60) days of entry of the Plea Agreement, MERCATOR shall designate a senior corporate officer as Corporate Compliance Manager (hereinafter "CCM") who shall report directly to the President and/or Managing Director of MERCATOR. MERCATOR shall provide the name of the CCM to the United States. The CCM should be the same individual as MERCATOR's "designated person" under the International Safety Management Code (hereinafter "ISM") unless reasons are provided to the United States justifying why the "designated person" should not also be the CCM. The CCM shall be responsible for coordinating with the Independent ECP Consultant (hereinafter "IC"), as more fully described below, developing and implementing all of the procedures and systems required herein, ensuring that reviews, audits and surveys are carried out as required and ensuring that all documents are properly maintained and that reports are made on a timely basis to the IC and the United States. All reports required under this ECP shall be reviewed by the CCM and signed under the penalty of perjury.

ATTACHMENT A to the Plea Agreement
Environmental Compliance Plan
United States v. Mercator Ship Management, S.A., d/b/a Bernuth Lines

(2) MERCATOR shall establish a procedure and reporting system that requires and enables all officers, crewmembers and employees, and shore side personnel involved in the manning and/or operation of seagoing vessels of MERCATOR's operated and/or managed vessels, including all persons working for MERCATOR, its subsidiaries, affiliated business entities (owned wholly or partially by MERCATOR) and agents of MERCATOR, to notify the CCM of any violations of any applicable environmental requirements or other requirements of this ECP and to cooperate fully with the IC in carrying out their reviewing, auditing and oversight functions required by applicable law and this ECP. MERCATOR agrees to establish a procedure that makes failure to notify the CCM of any violations of any applicable environmental requirements and failure to cooperate fully with the IC in carrying out their auditing and oversight functions required by applicable law and this ECP, grounds for dismissal. MERCATOR agrees not to retaliate against any officer, crewmember, employee, or shore side personnel involved in the manning and/or operation of seagoing vessels, including all persons working for MERCATOR, its subsidiaries, affiliated business entities (owned wholly or partially by MERCATOR) and agents of MERCATOR for making any such report.

(3) The CCM shall be authorized to access all records and personnel regarding all vessels subject to the ECP for the purpose of assuring compliance with the ECP. The CCM shall be authorized to implement all requirements of the ECP on all vessels subject to the ECP. The CCM shall ensure that audits and surveys are carried out as required, that all documents are properly maintained and that reports are made on a timely basis to the USPO, IC, the designated representative of the Coast Guard, and MERCATOR. The CCM position will be filled by an individual(s) with significant maritime vessel operational background, who possesses audit experience and is thoroughly familiar with the requirements of this ECP, and is knowledgeable about domestic and international maritime environmental laws and regulations.

CCM Responsibilities:

a. Development and Maintenance of Effective Training Programs

- To the extent not already completed, the CCM will be responsible for developing training programs to educate and train MERCATOR's employees of their environmental commitment, the requirements of the ECP, the policies and procedures for complying with the ECP, and the possible consequences to the MERCATOR's and to individuals for failure to comply with environmental laws.

b. Auditing and Compliance Assessment

- Ensure that the IC conducts the review and audits required by the ECP and that the required reports are prepared.

c. Fleet Reviews

3

ATTACHMENT A to the Plea Agreement
Environmental Compliance Plan
United States v. Mercator Ship Management, S.A., d/b/a Bernuth Lines

      - Supervise annual overall reviews of the environmental compliance programs and "focused" reviews of key environmental areas to promote the adoption of "best practices".

    d. Reporting of Non-Compliance by Employees and Crew Members

      - Establish a means by which employees may report (anonymously if so desired) issues of non-compliance with this ECP and any other procedure, policy, or regulation associated with environmental protection.

## C. MASTER and CHIEF ENGINEER

(1) The Master of each MERCATOR vessels subject to this ECP, with the assistance of the CCM, shall ensure that prompt reports are made to the United States Coast Guard of any non-compliant condition of any of MERCATOR's vessels that call upon any port or place in the United States or sail into any waters under the jurisdiction of the United States.

(2) The Chief Engineer on board all vessels subject to this ECP shall perform the following duties regarding this ECP:

      - Report to the CCM and cooperate with MERCATOR to resolve environmental concerns, such as inoperative or ineffective pollution prevention equipment and document all efforts to do so in a log that is available for review and audit at all times.

## D. INDEPENDENT ECP CONSULTANT (IC) AND ENVIRONMENTAL REVIEW

(1) No later than thirty (30) days following the District Court's final imposition of sentence in United States v. Mercator Ship Management, S.A., d/b/a Bernuth Lines, MERCATOR and the government shall jointly nominate three candidates for IC who meet the qualifications below to conduct an Environmental Review, and a Report of Findings for all of MERCATOR's operations as defined below. The Court shall select one of the IC candidates from the list and notify the United States and MERCATOR. If the Court determines that the proposed IC does not reasonably meet the qualifications set forth in the below paragraphs, or that past or existing relationships with the IC would affect the IC's ability to exercise the independent judgment and discipline required to conduct the ECP review and evaluation, or if the Court does not accept the IC's jointly proposed by the parties for any other reason, the parties shall propose a new list of potential IC's to the Court as expeditiously as possible.

(2) Qualified candidates for the IC position must have expertise and competence in the regulatory programs under U.S. and international environmental laws, and have expertise and competence in waste stream evaluation monitoring and control technologies, with a primary emphasis on engine room and machinery space operations, used by MERCATOR to achieve and maintain compliance in respect to MERCATOR's vessels

ATTACHMENT A to the Plea Agreement
Environmental Compliance Plan
United States v. Mercator Ship Management, S.A., d/b/a Bernuth Lines

subject to this ECP. The IC shall also have sufficient expertise and competence to assess whether MERCATOR has an adequate Environmental Management System in place to assess regulatory and ECP compliance, correct non-compliance, and prevent future non-compliance. MERCATOR and the United States acknowledge that the functions of the IC may, by mutual agreement, be fulfilled by one or more individuals.

(3) The IC must not directly own any stock in any of MERCATOR, its subsidiaries, affiliated business entities (owned wholly or partially by MERCATOR) or any agents of MERCATOR, and must have no other direct financial stake in the outcome of duties conducted pursuant to this Plea Agreement. The IC must be capable of exercising the same independent judgment and discipline that a certified public accounting firm would be expected to exercise in auditing a publicly held corporation. If MERCATOR has any other contractual relationship with the IC, both MERCATOR and the IC shall disclose to the United States such past or existing contractual relationships.

(4) The IC shall conduct an Environmental Review of MERCATOR's operations (vessel and shore side) and MERCATOR's seagoing vessels may be reviewed while the vessels are in port or while the vessels are on voyages of short duration (i.e., three days or less). MERCATOR and the IC shall coordinate the underway inspections to accommodate, as much as practicable, the vessel's operations and schedule. The Environmental Review shall be performed to ascertain and evaluate various aspects of MERCATOR's vessels: their systems, equipment and components; current practices whether documented or not; and the knowledge, skills, and abilities of ship and shore side personnel as they relate to the requirements of this ECP, and other maritime environmental protection requirements.

(5) The Environmental Review may be considered as a discovery action in that its purpose is to review all areas of operation that may impact various elements of pollution prevention and environmental protection. It will exceed a typical SMS audit in scope and will be used to determine practices, procedures and equipment conditions not typically documented during a routine inspection by class society, port or flag state inspection processes.

(6) The Environmental Review shall meet the following specific requirements:
   (a) It shall assess all waste streams developed from any system, equipment and components found in each machinery space onboard MERCATOR's vessels. This will include observation and documentation describing the leakages apparent on each system that can contribute to bilge loading. The audit will determine the status and quantify leakages stemming from:
      (i) all pump and valve seals and glands during operation,
      (ii) all piping systems, flanges, gaskets, fittings and joints,
      (iii) all equipment casings such as main and auxiliary engines, and reduction gears,
      (iv) operation of engines, boilers, incinerators, and evaporators, and
      (v) all other mechanical components found aboard MERCATOR's vessels.
   (b) It shall assess the adequacy and performance of the Oily Water Separator (OWS) and Incinerator, Sewage System, and any other pollution prevention equipment to handle the quantities and types of wastes, developed during normal operations. It will include

5

ATTACHMENT A to the Plea Agreement
Environmental Compliance Plan
United States v. Mercator Ship Management, S.A., d/b/a Bernuth Lines

an evaluation of the capacities for all tanks or containers associated with the management of sludges, bilges and oily wastes or other wastes. It will include an evaluation of documentation tracking, maintenance and repair, modifications of all pollution prevention equipment, and notifications of equipment failure to the CCM or other shoreside personnel.

(c) It shall assess the vessel's systems, equipment and components, in an effort to ascertain that even the least significant leakages contributing to waste streams are remedied in a prompt and effective manner.

(d) It shall assess the ability of the vessel's crewmembers to create, devise or implement an authorized process to dispose of a shipboard waste.

(e) It shall assess the adequacy of the vessel crewmembers to maintain the following records and includes a complete comparative analysis (against each other where possible) of the following records:

(i) Oil Record Book
(ii) Engine Room Alarms
(iii) Tank sounding sheets
(iv) Personal work records and lists
(v) Maintenance records
(vi) Vendor service records
(vii) Bilge waste and sludge receipts
(viii) Deck Log
(ix) Wastewater Discharge Log
(x) Oil to Sea Equipment Interface Logs
(xi) Hazardous waste manifests
(xii) Solid waste discharge receipts
(xiii) Content Monitor (OWS) calibration logs
(xiv) Training records
(xv) Vetting documents
(xvi) Inspection Documents
(xvii) SMS or SQE Audit documents.

(f) It shall assess the adequacy of the policy, procedures, and current practices used to store and dispose of:

(i) Solvents
(ii) Degreasers
(iii) Cleaning wastes
(iv) Batteries
(v) Paints
(vi) Oily rags
(vii) Fluorescent and incandescent bulbs
(viii) Expired boiler and engine chemicals
(ix) Used boiler and engine chemicals
(x) Galley greases
(xi) Pyrotechnics
(xii) Medical supplies
(xiii) Contaminate fuels
(xiv) Used oils and greases

ATTACHMENT A to the Plea Agreement
Environmental Compliance Plan
United States v. Mercator Ship Management, S.A., d/b/a Bernuth Lines

      (xv) Incinerator ash
      (xvi) Transformer oils
      (xvii) Contaminated refrigerants
      (xviii) Hazardous materials.

(g) It shall assess and evaluate documentation containing the certifications that all vessel officers understand the requirements of this ECP and shall require signed statements by all vessel officers attesting that they understand false entries in the Oil Record Book for Machinery Space operations is a violation of law.

(h) It shall assess the policy, procedures, and current practices associated with the Master and Chief Engineer's capability to communicate with shoreside personnel, including the CCM and designated persons, and shall review such communications.

(i) It shall assess the frequency and adequacy of, through interviews of crewmembers, shipboard pollution prevention and environmental protection meetings and training.

(j) It shall assess the policy, procedures, and current practices used on vessels and ashore to track crewmember environmental training, as well as the availability of and access to training resources.

(k) It shall assess the adequacy of existing hotline reporting methods to report environmental concerns and evaluate the capability of a reporting individual to remain anonymous, and review processes of handling environmental complaints from crewmembers and shoreside personnel.

(l) It shall assess the policy, procedures, and current practices to ensure that vessel vendors, technicians, and other non-crewmembers follow MERCATOR's requirements regarding pollution prevention and environmental protection.

(m) It shall assess the policy, procedures, and current practices used to manage the existing seal tracking and valve locking program, including the storage of seals and preventing the use of duplicate seals.

(n) It shall assess the policy, procedures, and current practices and equipment used to maintain refrigeration units, including availability and status of refrigerant recovery units, procedures for recovering refrigerants, and maintenance of a leak log.

(o) It shall assess the policy, procedures, current practices, and equipment related to Oil Transfer Procedures, including slops discharges, conditions of hoses, connections and transfer equipment, and shall include reviews of Declarations of Inspections.

(p) It shall assess the policy, procedures, current practices, and equipment used to handle emergency releases of hazardous fluids or pollutants on deck or within machinery spaces of vessels, including a review of the Shipboard Oil Pollution Emergency Plan and evaluation of personnel performing such duties.

(q) It shall include a survey of all fleet engineers at all levels for information on how to make the OWS, OCM, associated systems and waste management processes tamper proof and for methods on reducing or handling waste accumulations within machinery spaces. Participation shall be mandatory for all engineering personnel. The survey shall request the opinions of the vessels' engineers into their ability to adequately maintain the vessel systems, equipment and components. The survey will emphasize non-retaliation for open and honest opinions and reports of current non-compliant circumstances. The responses will be maintained in original format and made available to the IC. The original survey responses shall be included in the Report of Findings.

ATTACHMENT A to the Plea Agreement
Environmental Compliance Plan
United States v. Mercator Ship Management, S.A., d/b/a Bernuth Lines

(8) At the conclusion of the Environmental Review, but in no event later than one hundred twenty (120) days following the appointment of the IC, the IC shall prepare a Report of Findings. If the IC believes that additional time is needed to analyze available information, or to gather additional information, or to complete the Report of Findings, MERCATOR may request that the Government grant the IC such additional time, as required, which request shall not be unreasonably denied. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Report of Findings. The Report of Findings shall be provided to MERCATOR and the United States. Based on the Report of Findings, MERCATOR shall develop an Environmental Management System (hereinafter EMS) and Manual as described below.

## E. CORRECTIVE ACTION PLANS

No later than thirty (30) days following the conclusion of the Environmental Review, the CCM shall draft corrective action plans for all deficiencies found by the IC. The corrective action plans shall take into account any recommendations received from the IC, and they shall set forth each revision to Mercator's practices and policies that will be implemented in response to the Environmental Review. The corrective action plans shall be distributed to the IC, the USPO, the Coast Guard and the United States Attorney's Office for the Southern District of Florida.

Within sixty (60) days of issuing the corrective action plans, the CCM shall report on the status of implementation of each corrective action to the IC, the USPO, the Coast Guard and the United States Attorney's Office for the Southern District of Florida.

If Mercator is unable to complete the Corrective Action Plans within the above stated deadlines, Mercator shall immediately notify the United States Attorney's Office for the Southern District of Florida, and propose a revised timetable for these deadlines. Approval of the proposed revised timetable shall not be unreasonably withheld by the United States.

## F. NON-COMPLIANCE

(1) This ECP does not in any way release MERCATOR from complying with any applicable international conventions and treaties, State or Federal statutes and/or regulations, the ISM Code, or other international maritime conventions or treaties and does not limit imposition of any sanctions, penalties, or any other actions, available under those international conventions and treaties, State or Federal statutes and regulations, the ISM Code, or other international maritime safety conventions or treaties.

(2) The ECP shall be part of the Plea Agreement and adherence to it will be a condition of probation. Failure to comply with any part of this ECP (including but not limited to refusal to pay valid charges for the IC and failure to provide the IC access to vessels, facilities, personnel or documents) shall be a violation of the Plea Agreement and shall be grounds for the revocation or modification of MERCATOR's probation. Should the United States or the United States Probation Office seek to revoke or modify MERCATOR's probation based on MERCATOR's refusal to pay valid charges for the IC and/or its failure to provide the IC access to vessels, facilities, personnel, or

8

ATTACHMENT A to the Plea Agreement
Environmental Compliance Plan
United States v. Mercator Ship Management, S.A., d/b/a Bernuth Lines

documents, and/or as a result of any disagreement regarding any of the provisions of this ECP, MERCATOR shall have the right to contest the reasonableness of such revocation before the appropriate U.S. District Court.

## G. CCM/VESSEL MASTER RESPONSIBILITIES

The Master of any of MERCATOR's vessels covered under this ECP, with the assistance of the CCM, shall ensure that timely reports are made to the United States Coast Guard of any non-compliant condition of any of MERCATOR's operated and/or managed vessels that calls upon any Port or Place in the United States or sails into any waters under the jurisdiction of the United States. MERCATOR shall establish that enforcement of and employee compliance with the ECP, ISM Code, MARPOL, and all applicable State and Federal safety and environmental statutes and regulations is an important positive factor and that failure to comply with such policies, regulations and laws will be a negative factor in all appropriate personnel evaluations.

## H. ENGINEERING REQUIREMENTS

(1) Unless otherwise stated, all of the requirements set forth below, if not in contravention of any Class, Treaty or other Flag State requirements, shall be implemented on the vessels covered under this ECP as soon as practicable, as determined by the CCM and not later than one year from the date of the signing of the plea agreement.

(2) Bilge Main Cross – Connections:

   (a) MERCATOR shall immediately notify all of its vessels regarding the prohibition against non–emergency use of cross connections from engineroom bilge mains to the suction piping of larger pumps which may be referred to as the "fire and general service pump" or "fire, bilge and ballast" pump. The message shall state that the usage of these crossovers is similar to bypassing the OWS equipment and strictly prohibited.

   (b) The deck plates above or near the locations of these cross connections and the valves bodies and associated hand wheels shall be painted international orange. A brightly colored sign with three inch letters shall be permanently fixed nearby - "Bilge System Piping Crossover - Emergency Use Only."

   (c) To prevent unauthorized usage, Chief Engineers shall place numbered seals on these valves.

   (d) The seal numbers shall be tracked in a seal number logbook and explanations shall be given anytime a crossover to the bilge main is opened. Seals shall be used in other areas of the machinery space. The Master of the vessel shall retain the replacement seals in the vessel's safe. He/she will keep an additional log documenting when seals are replaced and their respective numbers. The CCM will be responsible for ensuring fleet wide that no duplication of seal numbers occur and will have a master tracking document indicating which series were supplied to each vessel.

   (e) If the valves are remotely operated from the engine control room, the control must also be disabled and notice made near the associated push buttons or switches. They shall also be sealed.

9

ATTACHMENT A to the Plea Agreement
Environmental Compliance Plan
United States v. Mercator Ship Management, S.A., d/b/a Bernuth Lines

(f) All other bilge suction valves not connected to the bilge main, including independent emergency suctions to the vessel's engineroom bilges like those that may be connected to sea water circulating pumps, will be painted brightly and labeled similarly "Emergency Bilge Suction - Emergency Use Only." Their valve wheels will also have a numbered and logged seal capable of breakaway during emergency. Seal numbers shall be kept in the the Chief Engineer's official seal log book and explanations given for breakage or replacement.

(3) Blank Flanges:

(a) To prevent unauthorized connections within the engine-room and machinery spaces of MERCATOR's vessels, every blank flange associated with any piping leading overboard, on systems such as salt water service, main engine raw water cooling or other systems, shall be permanently secured, removed or fitted with numbered seals through the flange bolts to prevent unauthorized connections and discharges. The seals used shall be numbered and records kept in the previously mentioned log.

(b) The blank flange securing the bilge and sludge transfer system and the shore connection discharge valve at the discharge stations shall also require a numbered seal that will be maintained. Seal numbers shall be kept in the Chief Engineer's official seal log book.

(4) Tank Sounding Log:

The CCM shall ensure the immediate usage of Tank Sounding Log Books on all vessels. Engineroom crewmembers shall be required to sound all waste, sludge, and bilge tanks associated with bilge water, oil wastes, or sludge during each watch for vessels having a manned engineroom or twice daily for those having an unmanned engineroom. The Tank Sounding Log shall be initialed by the crewmember that obtained the reading. The Tank Soundings Log shall be maintained in the engine control room and made available during all inspections and audits required by this agreement.

(5) Oil-to-Sea Interfaces:

(a) MERCATOR agrees to immediately develop for each vessel a log book relating to equipment having oil-to-sea interfaces. Such systems may be oil lubricated stern tubes, bow or stern thrusters, stabilizers, hydraulically operated controllable pitch propellers, and similar equipment whereby the leakage of a sealing component may cause a loss of operating medium into the surrounding waters of the vessel. Any replenishment of oil into the head tanks, operating systems reservoirs or other receivers associated with this equipment shall be logged regardless of quantity. Ingress of water into these systems must also be logged.

(b) When known, an explanation of the loss shall be provided, along with dates and time and signature. Routine stern tube lube oil loss must be logged and reported to the CCM immediately on each occasion. MERCATOR agrees to remove from employment any Chief Engineer who fails to report these conditions.

(6) Record Keeping:

(a) All Soundings and Logs required by this section shall be maintained onboard the vessel for a period of three years from the date of the final entry.

ATTACHMENT A to the Plea Agreement
Environmental Compliance Plan
United States v. Mercator Ship Management, S.A., d/b/a Bernuth Lines

## I. DOCUMENTATION AVAILABLE FOR INSPECTION

The CCM shall ensure that all documentation required by this ECP is maintained and available for inspection by the IC and the United States Coast Guard. The Master of each of MERCATOR's covered under this ECP, shall maintain on board the vessel, all records required by international conventions and treaties including SOLAS, the ISM Code, and MARPOL and applicable State and Federal statutes and regulations and any additional documents required under this ECP, such as crew training records, and will make these records available to the IC and the United States Coast Guard upon request. A summary of this information and any explanation, where appropriate, shall be included in the reports to be submitted to the United States by the IC.

## J. CHANGES IN OWNERSHIP/MANAGEMENT

The parties recognize that during the term of probation, the number and identity of vessels operated, managed, manned and/or controlled by MERCATOR that call on ports or places in the United States may increase or decrease. Any vessel, the operation, management, manning or control of which is assumed by MERCATOR, and which calls on ports or places in the United States shall be subject to the terms and conditions of this ECP. Any vessel removed from the operation, management, manning or control by MERCATOR, or which stops calling in the United States, shall be excluded from the scope of the ECP. MERCATOR agrees that it will immediately (but in no event later than 21 days following a change) notify the United States of any change in name, flag of registry, recognized organization, ownership or class society of any such MERCATOR's vessels, to include any vessel the operation, management, manning or control of which is assumed by MERCATOR and which calls in the United States. MERCATOR agrees that this ECP shall remain in effect for all of the aforesaid vessels regardless of changes in the vessels' flag of registry, recognized organizations, name, or class society, so long as the vessels are managed, operated or manned by MERCATOR. The MERCATOR shall notify the United States before any vessel is released from the requirements of the ECP due to a change in ownership, management, manning or control, or if such vessels cease calling on ports or places in the United States.

## K. SELF-ENFORCEMENT

MERCATOR further agrees that it will undertake and implement the necessary procedures to ensure that this ECP is diligently complied with by the officers and crew of each of MERCATOR's operated and/or managed vessels, as well as by all shore side employees, managers and other employees of MERCATOR's subsidiaries, affiliated business entities (owned wholly or partially by MERCATOR) and agents of MERCATOR engaged wholly or partially in the manning, and/or operation of aforesaid seagoing vessels or contracted to do the same, on the date of sentencing or at any time during the period of probation.

ATTACHMENT A to the Plea Agreement
Environmental Compliance Plan
United States v. Mercator Ship Management, S.A., d/b/a Bernuth Lines

## L. REVISIONS/MODIFICATIONS

The requirements of this ECP, including the dates and time periods mentioned herein, shall be strictly complied with. Should MERCATOR be unable to comply with any of the deadlines, MERCATOR shall immediately notify the United States in writing of the reason(s) for non-compliance, and propose a revised timetable. The United States shall then determine as to whether the revised timetable should be accepted.

## M. REPORTS

All reports, documents and correspondence required under this ECP to be sent on to the United States shall be sent on compact disc or paper to the following offices:

(a) U.S. Attorney's Office for the Southern District of Florida
99 N.E. Fourth Street, Suite 416
Miami Beach, FL 33132
ATTN: AUSA Jaime Raich

(b) United States Coast Guard
Office of Prevention
Seventh Coast Guard District
900 S.E. First Avenue
Miami, Florida 33131
Attn: Mr. Robert Kirk

(c) U.S. Probation Department for the Southern District of Florida
400 North Miami Avenue, Room 11-1
Miami, Florida 33128
Attn: Probation Officer

ATTACHMENT A to the Plea Agreement
Environmental Compliance Plan
United States v. Mercator Ship Management, S.A., d/b/a Bernuth Lines

## N. SIGNATURES

The Defendant has read this ECP carefully and understands it thoroughly. Defendant enters into this ECP knowingly and voluntarily, and therefore agrees to abide by its terms. By its signatures below, the corporate representative agrees that he/she is duly authorized by the corporation's Board of Directors or equivalent governing structure pursuant to the same notarized legal document filed in United States v. Mercator Ship Management, S.A., d/b/a Bernuth Lines, certifying that the defendant companies are authorized to enter into and comply with all of the provisions of this Plea Agreement.

DATED:                    MERCATOR SHIP MANAGEMENT, S,A.
                          d/b/a BERNUTH LINES

                  By: _____
                          JORDAN MONOCANDILOS
                          Authorized Representative of MERCATOR SHIP
                          MANAGEMENT, S.A., d/b/a BERNUTH LINES


As counsel for the Defendant we represent, we have discussed with our corporate client and its duly authorized representative the terms of this ECP and have fully explained its requirements. We have no reason to doubt that our client is knowingly and voluntarily entering into this ECP.

DATED:                    _____
                          MICHAEL G. CHALOS
                          Chalos, O'Connor and Duffy, LLP
                          Counsel for Defendants


On behalf of the United States, the following agree to the terms of the ECP:

DATED:                    WIFREDO A. FERRER
                          UNITED STATES ATTORNEY

                  By: _____
                          JAIME A. RAICH
                          Assistant United States Attorney


13